Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | | |
|---|---|---|---|
| **CASE NUMBER** | 99Cr469-1,4,6-10,19,21,32 | **DATE** | Mar. 15, 2002 |
| **CASE TITLE** | United States of America  v  THOMAS ROSS, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and order entered regarding determination of quantities for which defendants are responsible.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | MAR 22 2002 | |
| X | Notices mailed by judge's staff. | | date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | 715 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 02 MAR 21 PM 1:38 | date mailed notice | |
| GDS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THOMAS ROSS, JUAN HERNANDEZ, JOSE ) <br> RODRIGUEZ, FIDELMAR CORTES, MARCO ) <br> ZACARIAS, WALDEMAR GONZALEZ, ) <br> IGNACIOS MEDINA, MARLON REGALADO, ) <br> GERALD PITTMAN and LESLIE CHAMBERS, ) <br> et al.,[1] ) <br> ) <br> Defendants. ) | No. 99 CR 469 <br><br> Judge Robert W. Gettleman <br><br> DOCKETED <br> MAR 2 2 2002 |

## MEMORANDUM OPINION AND ORDER

In May 2000, the grand jury returned an indictment charging that "[f]rom on or before the early 1990s, until on or about June 30, 1999," defendants conspired among themselves and others "to distribute mixtures containing an excess of 5 kilograms of cocaine and 50 grams of cocaine base, commonly known as 'crack.'" The indictment also charged defendants with numerous individual counts involving specific drug transactions. On April 13, 2001, after a lengthy trial, the jury found all defendants guilty of the conspiracy count, and found all but one of the defendants guilty of at least some of the individual counts in which they were charged.. The matter is currently before the court to determine the quantities for which the following defendants are responsible for purposes of sentencing: Thomas Ross, Juan Hernandez, Jose Rodriguez,

---

[1] The ten defendants listed in the caption above are those who were tried and convicted in this case. Certain other defendants pled guilty, and one (David Hernandez) was severed and is awaiting a separate trial.

Fidelmar Cortes, Marcos Zacarias, Waldemar Gonzalez, Marlon Regalado and Gerald Pittman (hereinafter, "defendants").[2]

Answering special interrogatories, the jury found that a conspiracy to distribute or possess with the intent to distribute less than 500 grams of powder cocaine and more than 50 grams of crack cocaine had been proved beyond a reasonable doubt. Although the government concedes that the court cannot sentence any defendant to a term of imprisonment beyond the statutory maximum of 20 years (21 U.S.C. § 841(c)) based upon more than 500 grams of powder cocaine, Apprendi v. New Jersey, 530 U.S. 466, 1205 S.Ct. 2348 (2000), the government argues that the evidence clearly established that these eight defendants were responsible for far more than the quantities of both cocaine and crack cocaine necessary to impose the maximum guideline base offense level of 38 (i.e., 150 kilograms of cocaine and 1.5 kilograms of crack cocaine), under U.S.S.G. 2D1.1.

The government bases its position on the approximately three hundred taperecorded conversations played at the trial[3] that disclosed numerous drug transactions, the testimony of the cooperating witnesses at trial, a "drug ledger" seized from defendant Ross, and the amount of money seized from and discussed by the various defendants during the course of the conspiracy. In addition to the specific evidence mentioned above, the government suggests that the court can

---

[2]The court has previously determined the quantities for which defendants Leslie Chambers and Ignacio Medina were responsible.

[3]Although the government mentioned in its argument that there were thousands of other taped conversations that showed drug trafficking, the court agrees with defendants that for purposes of sentencing it will not rely on recorded conversations that were not presented at the trial.

2

extrapolate the amount of drugs involved in the conspiracy under Application Note 12 to

U.S.S.G. 2.D1.1, which provides in pertinent part:

> Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See §1B1.3(a)(2) (Relevant Conduct). Where there is not drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

Under Application Note 2 to U.S.S.G. 1B1.3, a defendant is "accountable for all quantities of contraband with which he was directly involved and, in the cases of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."

The government and the defendants have each filed at least one sentencing memorandum, and the court has heard extensive argument from counsel. Defendants' general position is that, when specific conversations are analyzed, the highest quantity for which any defendant can be held responsible is less than the amount advocated by the government. Defendants also argue that, under Guideline 1B1.3 (as referenced in Application Note 12 to U.S.S.G. 2D1.1), and cases like United States v. Edwards, 945 F.2d 1387, 1395 (7th Cir. 1991), the amount of drugs for which any defendant can be held responsible for purposes of sentencing must be found to be "reasonably foreseeable in connection with [the] criminal activity," and in furtherance of the jointly taken activity, and further that the court must determine the scope of each defendant's participation by examining "the level of commitment each defendant demonstrated toward

3

achieving the conspiracy's goals as evidenced by the scope of the agreement that the defendant entered into with his co-conspirators." Id.

The government cites the same standards in arguing that each of these defendants was indeed committed to the conspiracy for which they were convicted. Using the preponderance of the evidence standard, United States v. Pagan, 196 F.3d 884, 891 (7th Cir. 1999), the government argues that it has established that each of these defendants should be held responsible for quantities of both cocaine and crack cocaine far in excess of the maximum amounts set by U.S.S.G. 2D1.1 for an offense level of 38. As noted by Judge Plunkett in United States v. McCain, 1996 WL 616635 (N.D. Ill. 1996), a blanket approach that would hold all members of a drug conspiracy responsible for the total amount of drugs handled by the entire conspiracy is untenable under United States v. Willis, 49 F.3d 1271 (7th Cir. 1995), cert. denied, 116 S.Ct. 136 (1995). See also, Pagan, 196 F.3d at 891. Rather, the court "is required to make a detailed inquiry regarding each defendant's knowledge of the scope of the organization and the volume of its business." McCain, at *2.

As previously mentioned, the grand jury charged defendants with a drug conspiracy lasting almost ten years. Defendants were alleged to be members or associates of the Maniac Latin Disciples street gang ("MLD"), and the drug conspiracy centered around defendant Thomas Ross. The evidence disclosed numerous specific drug transactions, as well as the structure of the MLD sections in which these defendants were involved. The court agrees with defendants that the gang structure disclosed by the evidence was not exactly well organized, at least as compared to that of other cases with which this court is familiar. However, the government is correct in

4

arguing that the drug activities of these defendants were connected with their membership in or association with the MLDs and, more importantly, were centered around defendant Ross.

The evidence disclosed that Ross and his associates dealt in huge sums of cash used in connection with the purchase and sale of narcotics. In addition, the cooperating witnesses specifically testified to transactions involving more than 150 kilograms of cocaine and 1.5 kilograms of crack cocaine. Although, as the court instructed the jury, such testimony should be treated with great care and caution, and although the testimonies of these witnesses were impeached in many respects, their descriptions of the scope of the drug conspiracy were corroborated by the other evidence, including Ross's drug ledger and the hundreds of thousand dollars discussed in the tape recorded conversations and seized by the government from these defendants. Although defendants skillfully attacked the credibility of these witnesses, and correctly point out that in many of the recorded conversations it is difficult or impossible to tell what type of drugs were being discussed and, in at least some instances, whether the discussions were merely "boasting" or similarly unreliable banter about drug transactions, the court must respect the fact that the jury convicted all of these defendants of the conspiracy count beyond a reasonable doubt. Thus, many of defendants' arguments merely repeat the points they made in their motions for acquittal or a new trial, which were previously denied by the court. In short, the jury considered these arguments and rejected them.

Based upon the evidence summarized by the government at the hearing on March 1, 2002, the court finds that the government has proved that the drug conspiracy involved more than 1.5 kilograms of crack cocaine and at least 500 grams of powder cocaine. Because, under Apprendi, the court cannot sentence any defendant based upon more than the amount of powder

5

cocaine found by the jury (less than 500 grams), and because, as explained below, all but one defendant are responsible for a quantity of crack cocaine that exceeds the highest base offense level of 38 under U.S.S.G. 2D1.1, the court declines to enter what would essentially be an advisory opinion for all defendants except Gonzalez (as discussed below) on the quantity of that drug.

Defendants point out the arguably inconsistent finding by the jury that the conspiracy involved less than 500 grams of cocaine but more than 50 grams of crack cocaine, arguing that the former finding indicates that the drug conspiracy was far smaller in scope than alleged in the indictment and argued by the government for purposes of sentencing. The government argues that the finding that the conspiracy involved less than 500 grams of cocaine could be explained by a reluctance by the jury to "double count" the amount of powder cocaine that was being converted into crack. The tapes played for the jury of conversations that took place in the late 1998 and the first half of 1999 clearly disclosed that most of the powder cocaine possessed by various defendants was destined to be "cooked" into crack. Indeed, in numerous conversations various defendants were overheard to be discussing the process of "cooking" cocaine into crack, the demand for crack rather than powder cocaine, and in some cases the refusal to purchase the intended narcotics because it had not been properly "cooked." The court agrees with the government that the evidence established, by at least a preponderance, that in the latter part of the 1990s the conspiracy was primarily one to distribute crack cocaine. Accordingly, the jurors might well have been reluctant to assign a large quantity of powder cocaine to the conspiracy when they were convinced that those drugs were destined to be converted into crack. In any

event, the court finds no inconsistency with honoring the jury's determination that the conspiracy involved less than 500 grams of cocaine but more than 50 grams of crack cocaine.

With respect to the quantity of crack cocaine, the government's submissions concerning sentencing and quantity compute the amount of crack discussed in the various recorded conversations alone at 2.24 kilograms. Again, defendants skillfully attack certain of these conversations as failing to indicate the precise drugs being discussed (it appears that some of the discussions involved marijuana rather than cocaine or crack) or whether the transactions were real or merely fanciful. There is no escaping the fact, however, that even excluding the conversations so identified by defendants the remaining conversations indicate large amounts of crack cocaine that were unquestionably possessed and distributed by the various defendants. For example, defendant Ross calculates approximately 500 grams of crack transacted in various conversations which he does not contest. Likewise, defendant Rodriguez points out that after he was released from prison in November 1998, the amount of crack indicated by the various conversations totaled 173.5 grams. Similarly, defendant Cortes calculates approximately 1300 grams of crack in the conversations that he does not contest.

The problem with defendants' approach is that they are focusing on specific conversations, most of which the court will assume can be properly attacked in determining quantities. What defendants fail to argue successfully, however, is the broader picture to which the court is directed by Application Note 12 to U.S.S.G. 2D1.1. Thus, taking simply the uncontested conversations identified by the government in its sentencing memorandum, the evidence discloses more than a kilogram of crack over a sample of six or seven days. Obviously, despite defendants' arguments to the contrary, the evidence established that the drug conspiracy

7

for which these defendants were found guilty involved much more than the conversations the government identified or decided to play at the trial.

As disclosed by the testimony of the cooperating witnesses and, of great significance, Ross's drug ledger, the conspiracy involved far in excess of 1.5 kilograms of crack. The ledger shows approximately $442,000 in cash owed for drugs at one point in 1999. At the average price of $20,000 per kilogram,[4] this amount alone would total 22.1 kilograms of cocaine, distributed at a time when the powder cocaine was routinely being converted into crack. Taking an even more conservative approach, the government has totaled the amount of cash seized during the latter part of its investigation at $260,000. At the same price per kilogram, this would result in 13 kilograms of cocaine which, again, the evidence demonstrates was destined to be "cooked" into crack.[5] For purposes of sentencing, the court will assign this latter figure to the conspiracy which, as discussed above, is highly conservative to say the least. Moreover, based on the frequency and pervasiveness of the drug transactions, the quantity of drugs identified at the single point in time represented by Ross's drug ledger, and the corroborated testimony of the cooperating witnesses, the court finds that the conspirators distributed crack cocaine at an average rate of at least one-half kilogram per month--again, a highly conservative figure.

---

[4]This price was mentioned in at least one of the taped conversations by defendant Cortez.

[5]The trial record indicates that, according to Ross, cocaine was cooked into roughly equivalent quantities of crack. (See, Tape 1783, an intercepted conversation between Ross and Ricardo Villa on December 20, 1988.) The court finds that this evidence satisfies the "conversion ratio" requirement set forth in United States v. Slott, 245 F.3d 890, 911-912 (7th Cir. 2001).

8

The remaining task, as pointed out by defense counsel, is to determine the scope of each defendant's agreement and responsibility with respect to the conspiracy for which they were convicted.

**Thomas Ross**

Thomas Ross was, as mentioned above, the center of the government's case. He was identified continually as directing other defendants as well as others in the distribution of drugs throughout the period of the intercepted conversations. Ross either participated in the drug transactions proved by the evidence, or was mentioned by others as involved in most of them. Indeed, in its sentencing memorandum on quantity, the government identified 14 intercepted conversations involving approximately 2.25 kilograms of crack. Even subtracting from that total the conversations reasonably challenged by Ross as questionable, there remains approximately 1700 grams (1.7 kilograms) of crack transacted in these conversations alone - - which the government aptly describes as only a "slice" in the life of the conspiracy, and enough to put Ross at the maximum base offense level set by U.S.S.G. 2D1.1.

The court finds that the evidence - - including the intercepted conversations, the testimony of the cooperating witnesses, and the drug ledger, and the money seized by the government and discussed in the intercepted conversations - - clearly established that Ross was responsible for the entire amount of crack possessed with the intent to distribute by the conspiracy for which he was convicted.[6]

---

[6] Ross was also convicted of 16 separate counts.

9

**Juan Hernandez**

In his post arrest statement, Juan Hernandez admitted that he had been a member of the "Rockwell and Potomac" section of the MLDs for 20 years, and that he had been supplied with large amounts of marijuana by Ross. Many of the intercepted conversations establish that Ross was a constant supplier of marijuana, powder cocaine and crack cocaine to Juan Hernandez, and that they did drug business on a regular basis. Moreover, while not directly relevant to the issue of drug quantity, the evidence establishes that Juan Hernandez, along with another person, was in charge of the Rockwell and Potomac section of the MLDs, that Juan Hernandez possessed a firearm during his illicit activities, and that on at least one occasion he had attempted to kill a member of a rival gang.

It is clear to this court that Juan Hernandez was closely associated in the drug business with Ross and as a leader of the MLDs, and that the full amount of drugs attributed to the conspiracy was reasonably foreseeable to him throughout his participation in that conspiracy.[7]

**Jose Rodriguez**

As the government concedes, Jose Rodriguez did not enter the drug conspiracy until shortly after his release from prison in November 1998. Unfortunately for Rodriguez, however, his 15 years in prison were apparently misspent. Shortly after his release, on December 16, 1998, he contacted Ross and successfully sought to join the drug operation. His intercepted

---

[7] Juan Hernandez was also convicted of two separate counts.

conversations with Ross show Rodriguez's eagerness to obtain and sell drugs with Ross's assistance.[8]

Rodriguez is correct to point out that under U.S.S.G. 1B1.3 and cases such as United States v. Nichols, 75 F.3d 1137, 1143-44 (7th Cir. 1996), he cannot be held accountable for the conduct of co-conspirators prior to his joining the conspiracy for which he was convicted.[9] Unluckily for Rodriguez, however, as found above, the conspiracy was dealing in crack cocaine at the rate of at least ½ kilogram per month, and Rodriguez knowingly and enthusiastically joined this enterprise. Rodriguez's argument that his activity was limited only to cocaine rather than crack is belied by the evidence showing his knowledge that the powder cocaine was intended to be cooked into crack. Likewise, Rodriguez's argument that his dealings with Ross were isolated and small-scale are contradicted by the frequency of his involvement with Ross, the MLDs and the numerous transactions in which he participated.

The evidence clearly shows, therefore, that Rodriguez eagerly joined a conspiracy that was distributing large amounts of crack cocaine at a rate of at least ½ kilogram per month for the 6 ½ months between the time he joined it in mid-December 1998 until the arrests on June 30, 1999, that ended the conspiracy. The court finds Rodriguez responsible for 3 1/4 kilograms of crack cocaine.

---

[8]For example, Rodriguez is overheard in the December 16, 1998, conversation telling Ross that he knows "the dollars you have been clockin', I want to clock with you."

[9]Jose Rodriguez was also found guilty of two separate counts.

11

**Fidelmar Cortes**

The intercepted conversations establish that Fidelmar Cortes was one of Ross's key workers[10] in 1998 and 1999, following Ross's directions to deliver and facilitate the delivery of drugs, often using Ross's stash house for a base. On December 21, 1998, the Chicago police seized 173.5 grams of crack (apparently part of a 580 gram batch cooked by Ross the previous day) from Cortes, leading to Ross's direction to defendant Zacarias to clean out the stash house. Throughout many of the intercepted conversations, Ross refers to Cortes as one of his workers and directs Cortes to perform sundry activities in connection with the drug conspiracy.

Like most of the defendants, Cortes argues that he should be held accountable only for the specific quantities identified in the recorded conversations played at the trial, which he computes to total 1187 grams (1.187 kilograms) of crack. As discussed above, however, the sentencing guidelines direct a broader inquiry which, when applied to Cortes, clearly results in a finding that his close association with Ross's drug activities makes him responsible for full amount during the time he participated in the conspiracy for which he was convicted.[11] Generously assuming that Cortes's involvement in the conspiracy began in mid-1988, the court finds that he is responsible for 6 kilograms of crack.

---

[10]Cortes objects to any reliance by the court on Juan Hernandez's post arrest statement identifying Cortes as Ross's "righthand man," because this proffer was not admitted during the trial. Of course, under U.S.S.G. 1B1.3, the proffer can be referred to for purposes of sentencing. More importantly, however, the court does not need to rely on Juan Hernandez's statement; the evidence clearly demonstrates that if Cortes wasn't Ross's only righthand man, he was certainly one of them.

[11]Fidelmar Cortes was also convicted of three separate counts.

12

**Marco Zacarias**

Marco Zacarias lived at Ross's stash house and cared for the property and its contents. He was involved in - - and convicted in Counts 2 and 4 for - - the 173.5 grams of crack seized by the Chicago police from Cortes (mentioned above), as well as numerous other transactions directed by Ross. The intercepted conversations clearly establish that Zacarias was one of Ross's trusted workers who was fully committed to the enterprise. On numerous occasions, Ross tells his customers that drugs Ross is selling will be delivered by Zacarias. In one conversation Zacarias follows Ross's order to bring 2 ounces of cocaine and $90,000 to Ross (representing more than 2 kilograms of cocaine which, as found above, was destined to be cooked into crack).

Zacarias argues that his work for Ross was menial and that his limited intelligence is evident from the intercepted conversations. Although these factors may be considered in sentencing this defendant, they are not relevant to the determination of the quantities for which Zacarias may be held accountable.

The evidence clearly puts Zacarias in the thick of it with Ross, making him accountable for the entire amount attributed to the conspiracy for which he was convicted.[12] Assuming, generously to Zacarias, that his involvement was temporally co-extensive with that of Cortes (i.e., beginning in mid-1998), the court finds that he is responsible for 6 kilograms of crack.

**Waldemar Gonzalez**

Waldemar Gonzalez is identified in several intercepted conversations as participating in the sale of cocaine, and was named by a cooperating witness as having sold "dime bags" of

---

[12]Zacarias was also convicted of three separate counts, including the two mentioned above.

13

crack. He was acquitted of the only count charging him with possession (of cocaine on March 13, 1999), but convicted of the conspiracy count (Count 1) and the use of a telephone in committing the conspiracy (Count 30). Unlike the defendants discussed above, there is little evidence to show that Gonzalez was one of Ross's regular workers or that he participated in sufficiently numerous transactions to indicate that Gonzalez's drug dealings were centered through Ross. Indeed, the evidence seems to indicate a few isolated cocaine transactions involving Ross but, with one exception, none of the other defendants.

The government's principal argument supporting its position that Gonzalez should be held accountable for the entire quantity is testimony by several cooperating witnesses that Gonzalez was a leader of Ross's Beach and Paulina section of the MLDs. The court is mindful, however, that mere membership - - or even leadership - - in the gang is not the equivalent of responsibility for the entire quantity of drugs dealt by the gang. McCain, at *4. Gonzalez was not observed participating in drug distribution beyond the few intercepted conversations, his name was not in Ross's drug ledger, and, as mentioned above, he was acquitted of the one count charging him with possession with intent to distribute.

Accordingly, the court is not persuaded that the government has met its burden of proving by a preponderance of the evidence that Gonzalez was responsible for the entire quantity or that he was knowledgeable about or committed to the entire scope of the conspiracy. Apparently, because he was convicted of Count 1, Gonzalez suggests in his sentencing brief that he is responsible for "at least 500 grams but less than 2 kilograms of cocaine," equating to a base offense level under U.S.S.G. 2D1.1 of 26. The jury's finding, however, that the conspiracy distributed less than 500 grams of cocaine does not permit assigning Gonzalez, or any other

14

defendant, with responsibility for more than that quantity of cocaine, even though the evidence supports finding a greater amount. Accordingly, the court finds Gonzalez responsible for 499 grams of cocaine and 50 grams of crack.

**Marlon Regalado**

After serving a five year state prison sentence, Marlon Regalado was released in December 1998, and began using and dealing in drugs. The first conversation with Ross and connection to the drug conspiracy for which Regalado was convicted[13] occurred on February 25, 1999, approximately four months before the arrests that terminated the conspiracy. The intercepted conversations show that Regalado was both a supplier and a customer of Ross. The conversations also show that Regalado was a trusted associate of Ross and other leaders of Ross's drug enterprise, and was instructed by Ross on a number of occasions to assist in the delivery of drugs and cash.

Regalado's counsel skillfully establishes that the maximum quantities for which Regalado could be held accountable, based on the intercepted conversations, total 56 grams of crack and 31.5 grams of powder cocaine. As with similar arguments discussed above, however, the court cannot determine quantity based only on the transactions in which a defendant directly participated, but must determine whether the defendant knew the scope of the conspiracy that he joined and committed himself to that conspiracy. In the case of Mr. Regalado, the frequency and magnitude of the transactions in which he engaged with Ross establish that he was aware of the scope of Ross's drug enterprise and willingly became a part of it at least as early as February 25, 1999.

---

[13]Marlon Regalado was also convicted of three separate counts.

Accordingly, based on the conservative estimate of ½ kilogram of crack per month distributed by the conspiracy, the court finds Marlon Regalado responsible for 4 kilograms of crack cocaine.

**Gerald Pittman**

Like Jose Rodriguez and Marlon Regalado, Gerald Pittman served approximately five years in state prison, and was released on December 23, 1998. Unlike Rodriguez and Regalado, however, Pittman was a leader of a section of the MLDs in the early 1990s. In 1993, as part of a plea bargain in his state court case, Pittman testified that he was an active cocaine dealer and enforcer with the MLDs in the early 1990s.

Upon release in 1998, Pittman returned to his previous association with the MLDs and began or renewed his drug dealing relationship with Ross. The broad scope of Pittman's association with Ross's drug enterprise is extensively documented in numerous intercepted conversations throughout the period prior to the June 30, 1999, arrests. Although Pittman may be correct in arguing that he should not be regarded as part of the conspiracy during the period of his cooperation with law enforcement in 1993 through the date of his release in 1998, his extensive involvement with Ross thereafter clearly indicates that he knew of an participated in the full scope of the conspiracy for at least six months.[14]

---

[14]Pittman was charged only in Count I.

Accordingly, assuming the estimated rate of ½ kilogram per month distributed by the conspiracy, the court finds Pittman responsible for 3 kilograms of crack cocaine.

**SO ORDERED**

**ENTER:** March 15, 2002

Robert W. Gettleman
United States District Judge